[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 16, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15958
Non-Argument Calendar

_____

D. C. Docket No. 06-00099-CV-4-WS-WCS

BONNIE G. PETERS,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE[1],

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 16, 2007)**

Before BIRCH, CARNES and MARCUS, Circuit Judges.

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Mr. Astrue is substituted for Jo Anne B. Barnhart, the former commissioner, as the defendant-appellee in this action.

PER CURIAM:

Bonnie G. Peters appeals the district court's order affirming an administrative law judge's denial of her application for disability insurance benefits under 42 U.S.C. § 405(g). Peters contends that the ALJ erred in finding that she possessed the residual functional capacity to perform her past relevant work as a cashier or electronics assembler. For the reasons set forth below, we affirm.

I.

Peters filed an application for disability insurance benefits on February 13, 2002. In her application, Peters alleged that on November 6, 2001 she became unable to work because of degenerative disc disease, failed back syndrome, and fibromyalgia. The Social Security Administration denied her application on August 29, 2002. She then asked the SSA to reconsider its decision, and on March 26, 2003, it again denied her application. Peters then requested a hearing with an ALJ, which occurred in May 2005. At that hearing, Peters' principal support for her application came from her personal testimony and the medical records of two physicians, Dr. Michael Getter and Dr. Mark Lloyd. Because the procedural history and facts of this appeal are lengthy and complicated, we set forth only those portions that relate directly to our decision.

2

Peters was a 52-year-old high school graduate the time of her hearing in front of the ALJ. Her serious health problems began in 1998, when she had surgery to repair two ruptured discs in her back. Apparently, the surgery did not alleviate her back pain, and she now experiences pain whenever she sits, stands, or walks. According to Peters, she can sit for about 30 minutes before the pain in her back and hips forces her to alleviate the pain by either standing or walking for about 15 to 20 minutes, at which time she can sit for another 30 minutes. Peters testified that she can continue this routine of sitting and standing for about five or six hours a day. She also estimated that she can walk about eight blocks before the pain in her thighs compels her to rest.[2] However, she admitted to the ALJ that she is capable of climbing a flight of stairs, albeit with increased pain in her lower back and hips.

Peters takes prescription pain medicine to treat her pain, and she testified that those medicines frequently cause her to become drowsy. She also testified that she has problems sleeping at night because of back pain and muscle spasms.

When asked about her daily activities, Peters responded that, on a typical day, she gets up, takes her medicine and, once the medicine starts working, she

---

[2] Peters also testified that she has problems concentrating and with her memory, but she has not raised any issues relating to her mental faculties in this appeal.

cleans, cooks, and washes dishes. In the evenings, she watches TV or occasionally does needlepoint. According to Peters, she can only perform domestic chores for about 20 to 30 minutes without taking a break.

Peters has not worked since November 2001. She testified that she worked as a tool and die repairperson for the eight years preceding her alleged disability. Prior to that, she had worked as a cashier at a grocery store for 8 months and as an electronics assembler for one year. Before her job as an electronics assembler, Peters assembled electrical boxes. At Peters' hearing, a vocational expert testified that Peters' past relevant work experience as a cashier and electronics assembler was properly classified as "light exertional work."

In addition to her own testimony, Peters produced the medical records from two of her treating physicians. The first batch of physician records were the product of Dr. Michael Getter, an orthopedist who performed her back surgery in 1998 and who continued treating her until February 21, 2001. Dr. Getter's records indicate that Peters struggled with back pain while he was treating her and that he prescribed the powerful painkiller OxyContin to ease her pain. But his notes also demonstrate that Peters' condition improved as a result of his treatment, observing at one point that she could "walk normally" and that her back had responded "immensely" well to steroid treatments.

4

On February 13, 2001, Peters complained to Dr. Getter about having "multiple joint aches and pains." Dr. Getter responded by checking her for fibromyalgia, which is done by examining eighteen "trigger points"—points on the body of a person with fibromyalgia that exhibit soreness or experience pain when probed. Dr. Getter found only two such points on Peters' body and noted that she was "nowhere near what she would need to make the diagnosis of fibromyalgia." He did, however, note that the aches were not related to Peters' back problems and were possibly rheumatological.

Around February 20, 2001, more than nine months before Peters' alleged date of disability, Dr. Getter completed a "Medical Assessment of Ability to do Work-Related Activities" for Peters. In the assessment, Dr. Getter stated his opinion of Peters' work capacity: (1) she could not lift more than five pounds on a frequent basis; (2) she could not stand for more than a total of two hours a day at 30 minute intervals; (3) she could not sit for more than a total of two hours a day at 30 minute intervals; (4) she could not climb, crouch, stoop, or crawl, but could kneel occasionally; (5) her ability to push or pull was affected by her back pain; and (6) her inability to balance and her lack of flexibility also limited the type of work she could perform.

In a letter dated February 22, 2001, Dr. Getter wrote to the Social Security

5

Administration that Peters' back pain required her to shift positions frequently and prevented her from doing any meaningful type of work, including any type of work she had done previously. Dr. Getter also noted that he had treated Peters for the past several years. During his treatment he had found her complaints to be valid and her input to be trustworthy. He noted that Peters' decreased spinal flexibility and her back pain inhibited her ability to sit, stand, stoop, bend, or squat for prolonged periods of time. Based on his assessment of Peters' health, he concluded that she was unemployable. However, as noted by the ALJ's order, Getter did not cite any specific, objective medical evidence to support his conclusion.

The second batch of physician records that Peters used to support her application for disability benefits was the product of Dr. T. Mark Lloyd. Dr. Lloyd's records cover from March 10, 2001 until May 13, 2005, and they catalogue the same health problems that were treated by Dr. Getter.

In a March 15, 2001 examination (a month after Dr. Getter's last exam), Dr. Lloyd noted that Peters exhibited pain in 14 of the possible 18 trigger points for fibromyalgia. He also noted tenderness and a decreased range of motion in Peters' neck and lower spine. In April 2001, Dr. Lloyd noted pain or soreness in all 18 of Peters' fibromyalgia trigger points. In July 2001, he wrote in his records that

Peters' condition had improved, but Dr. Lloyd noted diffuse tenderness in some of her muscles and in her neck, as well as a decreased range of motion in her lower spine. In September 2001, he also noted that the results of a bone scan indicated that Peters had no inflammation in any of her joints.

As part of Peters' treatment, Dr. Lloyd prescribed bi-weekly physical therapy. From October 29, 2001 until February 13, 2002, Peters attended those prescribed physical therapy sessions. The physical therapist noted that Peters' condition did not impede her from participating in her therapy. In general, the therapy improved the range of motion in Peters' lower spine. On February 1, 2002, the physical therapist noted that Peters was experiencing soreness because she had been out on a boat, fishing. On April 12, 2002, Dr. Lloyd again noted that all 18 trigger points on Peters' body indicated that she had fibromyalgia, but he also noted that, overall, physical therapy was helping Peters, and she was tolerating her medicines.

For reasons not explained in her brief, Peters apparently did not undergo physical therapy for more than two years after her visit to Dr. Lloyd in April 2002. However, from March 9, 2004 until May 20, 2005, she returned to physical therapy, attending sessions about once per week. During those sessions, she complained about pain and soreness. However, Peters also reported that she had

7

been supplementing her physical therapy with pilates yoga.

On May 13, 2005, Dr. Lloyd completed a "Residual Functional Capacity Evaluation" that was based on his assessment of Peters' condition between March 10, 2001 and March 31, 2004. In the evaluation Dr. Lloyd stated his opinion that during an eight hour workday Peters could stand or sit for thirty minutes to one hour without taking a break and could lift or carry up to five pounds. According to the evaluation, Peters would be unable to complete a normal workday without an unreasonable number of breaks to manage her pain.

Other physicians reached conclusions about Peters' condition that differed from the conclusions of her treating physicians. For instance, in a July 31, 2002 disability evaluation, Dr. Jesse Lipnick reported that Peters' grip strength and ability to manipulate objects with her fingers were within normal limits and that she could walk with good balance, although he did acknowledge that Peters' left hip exhibited a reduced range of motion and was subject to muscle spasms. In his conclusion, he agreed with Dr. Getter that Peters' lower back pain had reduced her work capacity, but he did not elaborate on what type of work, if any, that she was capable of performing.

An elaboration on Peters' work capacity came on August 21, 2002, when Dr. Robert Steele prepared a "Physical Residual Functional Capacity Assessment."

8

According to Dr. Steele, Peters had the capacity to: (1) lift or carry 20 pounds occasionally; (2) lift or carry 10 pounds frequently; (3) stand or walk with normal breaks for about 6 hours in an 8-hour workday; (4) sit with normal breaks for about 6 hours in an 8-hour workday; and (5) push or pull without special restrictions. Dr. Steele's exam results indicated that Peters' strength score was a five out of five and that her gait, grip, and ability to manipulate objects with her fingers were all within normal limits. He also noted that she had spasms in her back muscles and a decreased range of motion in her lower back.

On February 13, 2003, Dr. Abdel Ramadan reported that Peters had a full range of motion in all of her joints and in her spine. He stated that Peters could dress herself, open and close doors, and complete repetitive motions.

On March 7, 2003, Peters underwent another Physical Residual Functional Capacity Assessment, performed by another doctor,[3] which indicated that she could: (1) occasionally lift or carry 20 pounds; (2) frequently lift or carry 10 pounds; (3) stand or walk for about 6 hours in an 8-hour workday; (4) sit for about 6 hours in an 8-hour workday; and (5) push or pull for an unlimited amount of time. The doctor also noted that Peters could occasionally climb stairs and ladders, balance, stoop, kneel, crouch, and crawl.

_____

[3] The doctor's signature is illegible. (See AR at 261).

9

The ALJ denied Peters' application for disability benefits. In reaching his decision, the ALJ followed the five steps set forth in 20 C.F.R. § 404.1520 for determining whether a claimant is legally disabled. Those five steps require that the ALJ: (1) determine whether the claimant is currently performing substantial gainful work; (2) if the claimant is not performing substantial gainful work, determine whether the claimant's impairment(s) are "severe"; (3) if the claimant's impairment(s) are severe, determine whether the impairment(s) has lasted or is expected to last for at least 12 months; (4) if the impairment(s) will last 12 months, determine whether the claimant's impairment(s) prevent her from doing her past relevant work; and (5) if the impairment(s) prevent the claimant from performing her past relevant work, determine whether other work exists that would accommodate her residual functional capacity. See 20 C.F.R. § 404.1520.

The ALJ found that Peters satisfied the first three steps. However, he found that even after accounting for Peters' "severe" impairments, she still possessed the residual functional capacity for light work, making her capable of performing her past relevant work as a cashier or an electronics assembler. Therefore, he found that she was not disabled and denied her benefits application.

Peters appealed to the district court, arguing that the ALJ erred by refusing to give controlling weight to the opinion of her treating physicians. A federal

magistrate judge, in his report and recommendation, agreed with Peters and recommended that the ALJ's order be reversed. The district court, however, rejected the magistrate judge's report and affirmed the ALJ's order, determining that the ALJ did not err in declaring to give controlling weight to the opinions of Dr. Getter and Dr. Lloyd.

## II.

On appeal, Peters contends that the ALJ erred at step four of the five-step analysis set forth in 20 C.F.R. § 404.1520, because he incorrectly found that she possessed the residual functioning capacity to perform her past relevant employment. Her brief does not set forth with great clarity specific arguments in support of that contention. However, after reviewing her brief and the record on appeal, there apparently are two overlapping arguments for her position. The first argument is the same one she made to the district court: that the ALJ improperly discounted the evidence provided by her treating physicians. The second argument is more specific, stating that the ALJ erred by requiring objective medical evidence to support her claims of fibromyalgia. The government responds that the ALJ's findings are supported by substantial evidence.

We review the Commissioner's decision in order to determine whether it (1) is supported by substantial evidence and (2) was based on correct legal standards.

Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). We will not substitute our judgement for that of the Commissioner. See Barnes v. Sullivan, 932 F.2d 1356, 1357–58 (11th Cir. 1996). "Substantial evidence is something more than a mere scintilla, but is less than a preponderance," Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted), and "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion," Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted). "Even if the evidence preponderates against the Commissioner's findings, [this Court] must affirm if the decision reached is supported by substantial evidence." Id. at 1158–59 (quotation marks and citations omitted).

As Peters points out in her brief, the testimony or opinion of a treating physician must be given substantial or considerable weight unless there is "good cause" not to. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). In Lewis we stated that "good cause" exists where (1) the treating physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with his own medical records. Id. However, the ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so

12

constitutes reversible error.  Id.

In this case the ALJ found good cause to discount the treating physicians' opinion and clearly articulated his reasons for doing so.  He noted the discrepancies between the physicians' disability evaluations and their treatment notes.  For example, the ALJ found that both Dr. Getter and Dr. Lloyd had followed "conservative" courses of treatment and had noted that Peters responded well to physical therapy and to anti-inflammatory injections.  Likewise, the ALJ observed that a September 2001 bone scan showed no inflammatory sites and did not support Peters' complaints of body pain.  In addition, at least three other physicians examined Peters and assessed her health as being much better than indicated by Dr. Getter or Dr. Lloyd.  Moreover, the ALJ found that, in light of Peters' medical history, the degree of treatment she required, and her description of her daily activities, her testimony about her condition was "not entirely credible."  See Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) ("[C]redibility determinations are the province of the ALJ.").

Given the inconsistencies between the notes and the disability evaluations of Peters' treating physicians, there was a legitimate reason for the ALJ to discredit their evaluations and to place greater weight on the evaluations of other physicians who evaluated Peters.  And Peters has not shown that those other

evaluations do not constitute substantial evidence from which the ALJ could reasonably determine that Peters has the residual functional capacity to perform her past relevant work as a cashier or electronics assembler. See McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) (noting that the severity of a disability "must be measured in terms of its effect upon ability to work").

Peters also argues that the ALJ erred by requiring that her diagnosis of fibromyalgia be supported by objective medical evidence. To support that argument, she correctly observes that one hallmark of fibromyalgia is a lack of objective evidence. From that observation she argues that our unpublished opinion in Stewart v. Apfel, No. 99-6132, 2000 U.S. App. Lexis 33214 (11th Cir. 2000), should control the outcome of this case. Peters acknowledges that Stewart is merely persuasive authority, but she nonetheless argues that it should persuade us in this case.

We reject her argument for two reasons. First, we are not persuaded by the unpublished Stewart opinion. The facts of this case are distinguishable from the facts of that case. In Stewart there was no other medical evidence that contradicted the treating physician's diagnosis of fibromyalgia. Id. at *5–*9. The ALJ did not articulate any specific reasons for rejecting the ALJ's testimony. Instead, he simply rejected the treating physician's testimony because there was no

14

objective medical evidence supporting his diagnosis.  Id.  Here, there not only is objective medical evidence, such as Peters' bone scan, supporting the ALJ's conclusion, but there also is opinion evidence from other physicians that disputes the conclusions of Peters' treating physicians.

The second and more important reason that we reject Peters' argument that Stewart should persuade us is our decision in Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005), where we concluded that the ALJ did not err in discounting the opinion of the plaintiff's treating physician that the plaintiff's fibromyalgia was disabling.  In Moore we stated that "[w]hile a treating physician's testimony can be particularly valuable in fibromyalgia cases, where objective evidence is often absent, the ALJ . . . adequately articulated specific justification for discounting [the treating physician's] opinion."  Id.

Likewise, the ALJ in this case gave specific, cogent, and credible reasons for discounting the conclusions of Peters' treating physicians.  He found that the conclusions that they wrote on the evaluation forms to support Peters' disability applications were inconsistent with their own treatment records.  Furthermore, each physicians' opinion of Peters' fibromyalgia differed:  in February 2001 Dr. Getters found that only 2 of the 18 trigger points on Peters' body suggested that she had fibromyalgia, but less than one month later Dr. Lloyd found that 14 of the

15

18 trigger points indicated the Peters was suffering from fibromyalgia. The ALJ also noted the inconsistencies between Peters' claims of disability and her testimony regarding her ability to perform various tasks around her home. See id. ("[T]he ALJ here relied on the inconsistencies between Moore's descriptions of her diverse daily activities and her claims of infirmity."). Therefore, there is substantial evidence to support the ALJ's finding that Peters' fibromyalgia did not prevent her from performing her past relevant work.

**AFFIRMED.**